*Melissa Morton*
*2207 Hermosa Ave.*
*Hermosa Beach, CA 90254*
*310-374-6039*

**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CV09  1875 · PA (JCx)**

SEAN DAVID MORTON,                          ) Civil Action No. _____
MELISSA MORTON,                             )
                                            )
        Plaintiffs,                         )
                                            )   **COMPLAINT**
vs.                                         )
                                            )
BENNETT ELLENBOGEN,                         )
TIM JOHNSON,                                )
ERIC HOLDER, Jr.,                           )
Attorney General of the United States,      )
THOMAS P. O'BRIEN, U.S. Attorney            )
For the Central District of California,     )
And other unknown federal employees,        )
                                            )
        Defendants.                         )
_____     )

## STATEMENT OF THE CASE

Plaintiffs are the targets of an investigation by the United States Securities and Exchange Commission ("SEC") launched by two (or more) dishonest and incompetent SEC employees, who apparently need to justify a trip to California in order to visit Disneyland and eat In And Out Burgers at the taxpayers' expense.

That Plaintiffs will be indicted is a foregone conclusion, regardless of guilt or innocence, due to a directive issued by the first Bush administration in 1989.

Rather than go to a jury trial, the wrong a federal defendant should suffer is whatever the prosecutor wants not what justice is called for.

## JURISDICTION

1.   Jurisdiction of this Court is invoked pursuant to:

     a.   Title 5 U.S.C. § 703 of the Administrative Procedure Act;

     b.   Federal Rule of Criminal Procedure 6(a), to convene a grand jury;

1

3/18/2009 4:02:56 PM  Receipt #: 116916
Paid by: Cashier: LLLING [LA'I-1]
Paid by: SEAN DAVID MORTON
2:CV09-01875
2009-086900          5 - Civil Filing Fee(1)
Amount:                              $60.00
2:CV09-01875
2009-510000         11 - Special Fund F/F(1)
Amount:                             $190.00
2:CV09-01875
2009-086400          Filing Fee - Special(1)
Amount:                             $100.00
M.O. Payment : P0972 /               350.00

1      c.     Title 18 U.S.C. § 3332(a), citizen access to the Special Grand Jury;

2      d.     Title 28 U.S.C. § 1331, the general federal question statute;

3      e.     Title 28 U.S.C. § 1361, to compel an officer of the United States to do

4      his duty;

5      f.     Title 28 U.S.C. § 1651, the All Writs Act;

6      g.     Title 28 U.S.C. §§ 2201 and 2202, the federal declaratory and injunctive

7      relief statutes;

8      h.     Title 42 U.S.C. § 1985(2), conspiracy against the rights of citizens;

9      i.     Title 18 U.S.C. § 1964, the Racketeer Influenced and Corrupt

10      Organizations Act (commonly referred to as RICO).

11      **VENUE**

12    2.     Venue is proper under 28 U.S.C. § 1391(e)(2) and (3), which states:

13      (e) A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color

14      of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which

15

16      (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or

17

18      (3) the plaintiff resides if no real property is involved in the action. Additional persons may be joined as parties to any such action in accordance

19      with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party.

20

21      **PARTIES**

22    3.     Plaintiff Sean David Morton is a private citizen with an address of 2207

23    Hermosa Avenue, Hermosa Beach, California 90254.

24    4.     Plaintiff Melissa Morton is a private citizen with an address of 2207 Hermosa

1   Avenue, Hermosa Beach, California 90254.

2       5.      Defendant Bennett Ellenbogen is Senior Counsel for the U.S. Securities and

3   Exchange Commission with a business address of U.S. Securities and Exchange Commission,

4   New York Regional Office, 3 World Financial Center, Branch of Enforcement No. 12, Room

5   400, New York, New York 10281-1022.

6       6.      Defendant Tim Johnson is a U.S. Securities and Exchange Commission

7   employee with a business address of U.S. Securities and Exchange Commission, New York

8   Regional Office, 3 World Financial Center, Room 400, New York, New York 10281-1022.

9       7.      Defendant Eric Holder, Jr. is the Attorney General for the United States of

10  America with a business address of United States Department of Justice, 950 Pennsylvania

11  Avenue, NW, Washington, DC 20530-0001.

12      8.      Defendant Thomas P. O'Brien is the United States Attorney for the Central

13  District of California with a business address of U.S. Attorney's Office, Central District of

14  California, Suite 1200, 312 North Spring Street, Los Angeles, California 90012.

15                                  **FACTS**

16      9.      Plaintiff Sean Morton ("Morton") has lived in the same rented house in Hermosa

17  Beach, California since 1983.

18      10.     Morton has driven the same car, a 1975 Fiat Spyder, since 1982, as he is a

19  person who has attempted to be a person of spirit his entire life, rather than a man of money

20  and finance.

21      11.     For 17 years, as a radio talk show guest and national radio talk show host,

22  Morton has used his psychic and intuitive abilities to make stunningly accurate predictions

23  about the stock market, and the U.S. and world economy. Morton has *never* owned or

24  profited from the stocks that he has recommended to others, with the sole exception of

                                        3

1   NUTRA CEA, which Morton made clear that his wife, plaintiff Melissa Morton ("Melissa"),

2   owned at the time and the stock was restricted and could not be sold when Morton made

3   specific recommendations.

4       12.     In that time, Morton has *never* claimed to be a licensed broker, trader, or

5   investment advisor and has always maintained that he is a "talented amateur" and a "psychic

6   intuitive."     Morton has also made very clear that his predictions were given for

7   "Entertainment purposes *only*" and that anyone listening to him needed to "check with

8   professionals before making any investment decisions." Morton has made this caveat during

9   virtually every radio appearance relating to the stock market or any stock he has

10  recommended.

11      13.     The Delphi Associates Investment Group has *never existed* as a DBA, LLC,

12  Corporation, Trust or any legal entity whatsoever.

13      14.     Morton has *never* advertised for Foreign Exchange ("FX") trading on the radio,

14  in his private subscription-only newsletter, or on his website. Morton has *never* sent out any

15  non-solicited SPAM emails or materials whatsoever.

16      15.     Any and all materials given out were in direct response to requests and inquiries

17  *only*.

18      16.     At the time Morton set up accounts for FX trading he could find no laws,

19  regulations or codes, relating to the SEC regulating either *Hedge Funds* or FX trading

20  accounts.

21      17.     Regulations by the SEC appear to state in essence that "We regulate any thing

22  that we regulate and we regulate everything that we *don't* regulate" and are vague and

23  misleading.

24      18.     All persons who privately contracted with Vajra Productions, LLC, 27

4

1    Investments, LLC, or Magic Eight Ball Distributing, Inc., *never* bought, nor were sold, a

2    stock, a bond, a security or were brought into any LLC, Corporation, Trust or DBA as a

3    partner or shareholder. Those persons became part of an investment club that provided funds

4    to be transferred to accounts at FXCM where it remained currency for FX trading, which the

5    SEC *does not regulate.*

6        19.    Morton *never* received funds directly from any person or individual. *All* funds

7    were provided to the above entities.

8        20.    Plaintiffs allege that a *pre-existing relationship* between Defendant Bennett

9    Ellenbogen ("Ellenbogen"), Senior Counsel for the SEC and Christopher Bass ("Bass"), led to

10   this current investigation and future prosecution.

11       21.    Bass made a series of threats against Morton, Melissa, and Daryl Weber

12   ("Weber"). These included threats of personal slander, Internet libel, physical harm and Bass

13   even went so far as to contact one individual about putting a *voodoo curse* on them all. Part

14   of Bass' threats included his going to the SEC and naming Bennett Ellenbogen as his friend,

15   who would "Get them" and "Do them in!"

16       22.    Bass filed a lawsuit, which is currently pending against the Mortons, Weber,

17   Vajra Productions, LLC, 27 Investments LLC, Magic Eight Ball Distributing, Inc., and The

18   Delphi Associates Investment Group (which does *not* exist as any sort of legal entity.)

19       23.    Evidence used against Plaintiffs was provided by Carol Dunn ("Dunn"). Dunn's

20   grip on sanity can be termed tenuous at best. Dunn invested $20,000 just before the Asian

21   currency meltdown in November 2006. Dunn lost $17,500. Dunn did not want to be treated

22   like the other investors or accept a loss in an investment that was explained to her over and

23   over again was an extremely high risk "Casino Investment," where funds could be lost in the

24   blink of an eye.

24.     Dunn demanded all of her money back and sent a letter threatening blackmail in the form of slander and libel, legal action, and complaining to the SEC.

25.     When told the funds were simply gone and attempts were being made to recover the losses, Dunn demanded what was left in her account. Dunn received a check for $2500, the balance of her account. Dunn accepted and cashed the check, with the clear understanding that if she liquidated her position she would take the loss.

26.     After a full accord and satisfaction and after cashing the $2,500 check, Dunn then sued the Mortons, Weber, Vajra Productions, LLC, 27 Investments LLC, Magic Eight Ball Distributing, Inc., and The Delphi Associates Investment Group in New York Superior Court and lost, based on simple accord and satisfaction. The judge found Dunn was fully warned of the risks of investing in FX, and ruled against her.

27.     Weber clearly targeted Morton when he approached Morton who was speaking at a University Conference in Montreal Canada in 2006. Weber presented himself as an experienced FX trader with a proven track record.

28.     Morton only discovered much later that Weber was, in fact, hiding out in Canada to escape prosecution on charges of financial fraud in the United States—specifically Oregon. Morton only found this out after all of the money was gone and Weber had walked away with nearly $500,000 in "profits" all of which he transferred to off-shore accounts.

29.     Throughout this process, Weber called the shots. Weber said FX was not regulated by the SEC and advised Morton on the setting up of new accounts. Weber explained that he was an experienced trader, having done all this before, and that SEC regulations were not a concern because they did not regulate this field of investment. Morton was totally taken in by Weber, as were so many others.

30.     At no time did Morton ever represent himself as the trader of the accounts.

6

1  Morton had *no experience* in FX, and *no experience* as a trader, or broker of any kind.

2  Morton had *never* done any of this type of investing before and trusted in Weber's so-called

3  experience, expertise, and advice.

4      31.    Weber did *all* of the accounting, including calculating how much he was to be

5  paid up front for his share of "profits" each week. Morton has multiple witnesses to support

6  this.

7      32.    Weber and his company Fraser Valley Trading, with his associates Deanna

8  Anderson and Lenore Rabbit, took over *all aspects* of the accounts, including all

9  communications, in February 2007, after the accounts had melted down. They did virtually

10  *nothing* in the time they managed the accounts, and then in October 2007, Deanna Anderson

11  abruptly quit, citing "too much liability," and handed the entire mess back to Morton to deal

12  with.

13      33.    Morton never presented himself as anything other than a psychic/intuitive that

14  was attempting to use his abilities to advise Weber in making trades. It is a matter of record

15  that Morton's predictions of what the markets and specific currencies like the Euro, would do,

16  were, in fact, accurate. Weber not only constantly ignored Morton's advice, but also seemed

17  to do the exact *opposite* of what Morton was telling him. There are numerous witnesses to

18  these facts.

19      34.    Weber later claimed he was making financial decisions based on a science

20  fiction story he believed to be true called *The Wingmakers*. It, obviously, turned out to be

21  dead wrong.

22      35.    Weber still remains the *only person* to profit and benefit from this entire fiasco,

23  walking away with nearly $500,000 in "profits" he claimed to have earned.   The SEC

24  investigation has delayed legal action the Mortons have been considering against Weber on

7

1   behalf of the investment club and themselves. And yet, it seems apparent, the SEC is taking

2   *no action* against Weber, who is the mastermind and sole profiteer of this enterprise.

3       36.   The SEC attorneys, Ellenbogen and (his partner/assistant?) Defendant Tim

4   Johnson ("Johnson"), made it abundantly clear that they had no grasp or understanding

5   *whatsoever* of how Foreign Exchange trading worked, or even the essentials of what it was.

6   All witness transcripts will prove this.

7       37.   Ellenbogen and Johnson asked what a "PIP" was, the basic measurement in FX.

8   They constantly asked how this was different from stocks. They continued to try to

9   understand it in *terms* of stocks, when there is no comparison. They asked why the FX

10  trading decisions were not put up to a "Vote" by the other investment club members. That

11  would have been clearly impossible.

12      38.   The sheer ignorance of Ellenbogen and Johnson was utterly astounding. Morton

13  asked them numerous times, "What is your jurisdiction here?" and "How can you pretend to

14  regulate something you clearly have *no understanding of*?" They *never* answered either

15  question.

16      39.   Ellenbogen and Johnson made it clear to the Mortons and their attorney, Pedar

17  Davission, that they wanted to "GET" someone who lived in California, so they could get a

18  vacation, visit friends, go to Disneyland and get In And Out Burgers, which seemed to be an

19  obsession with both of them.

20      40.   The complete and utter unprofessional conduct of Ellenbogen and Johnson was

21  evident when on both days of testimony by the Mortons, they were 45 minutes late for the

22  afternoon sessions because they were caught in traffic getting In And Out Burgers.

23      41.   The testimony of Melissa Morton was rushed through on Thursday so

24  Ellenbogen and Johnson could get done early and "get on with their vacation," visit friends,

1   and go to Disneyland.

2   42.   Ellenbogen made it clear to Attorney Davission that Weber was the focus of this
3   investigation, *not* the Mortons, another lie on his part.

4   43.   Morton had established previous relationships with all investment club members
5   through his subscription-only Delphi Associates Newsletter and public speaking appearances.

6   44.   The "evidence" used to "prove" that Morton had "advertised" the investment
7   club, was a few paragraphs in an article Morton had written about the FX trading that was
8   being done by Weber where Morton was using his intuitive techniques to advise him and that
9   Weber had noticed a massive manipulation of the FX markets by insiders and some "invisible
10   hand" controlling the world markets.   This "advertising" was in the Delphi Associates
11   Newsletter, which is *not* available to the general public—only available to *private subscribers*
12   at a cost of $65 per year.

13   45.   Claims of "Money Laundering" by the SEC appear to be a "scare tactic."
14   Money laundering is supposed to mean that the funds must have come from some illegal
15   source. *All* investment club members were provided with 1099 IRS Tax forms, showing their
16   profits and losses for the period the accounts were open. These forms were submitted to each
17   person participating and to the IRS.

18   46.   Morton was the single biggest *loser* in the investment club.   Morton lost over
19   $200,000 of his own money, right along with everyone else in the club.

20   47.   Weber was responsible for all accounting of the accounts, including a weekly
21   statement, which showed how much *he* was owed in "Profits."   Weber demanded all money
22   he owed *up front* for his services.   Weber left *none* of his own money in the accounts and
23   transferred everything he made to offshore accounts.

24   48.   *All club members* were immediately informed of over 60% losses in the

9

1  accounts due to the meltdown of the Asian currency markets and Weber not doing as he was

2  told on December 7, 2006.  Morton asked all those involved at that time if they wanted to

3  close their accounts and take the losses or keep trading in an attempt to make it back.  The

4  responses were overwhelmingly in favor of the continuance of trading.  Included among the

5  responses was a positive "keep going" response from Christopher Bass.

6       49.    In the spring of 2007 Weber informed Morton that *no funds* could be withdrawn

7  from the accounts as it would "collapse the margins," crash all the investments, and wipe out

8  the accounts. This left Morton in the position of trying to help those in dire need who wished

9  to withdraw what was left of their money.  Morton pulled over $80,000 of his own funds to

10  pay the people who did want out of it.  Morton took over their positions in the FX fund after

11  fronting them the cash, hoping the funds would be recovered, but that never happened. This

12  was part of Morton's attempts to *help* those in the club, all of whom he considered his friends.

13       50.    The SEC was told that *all* of Morton's radio appearances on Coast To Coast AM

14  were archived on the Coast To Coast AM website, and that Morton did *not* have recordings of

15  them. Those recordings could have *easily* been downloaded from the Internet by Ellenbogen

16  or any of his associates.  There was only one show in question where Morton mentioned he

17  was involved in an FX trading club where they had made profits.

18       51.    Instead, as further evidence of Ellenbogen's relationship with Chris Bass and

19  that this investigation is some kind of personal vendetta, Ellenbogen sent the SEC subpoena's

20  to Premiere Broadcasting owned by Clear Channel, which was for a long period of time,

21  essentially, Morton's employer.

22       52.    Ellenbogen's action has now ended Morton's 17-year radio career as the number

23  one guest on Coast To Coast AM, as Premiere Broadcasting has now *banned* Morton from the

24  show due to that subpoena and this investigation, causing him extreme financial hardship,

10

1   severe damage to his reputation, and millions of people clamoring to have Morton back on the

2   show, with a wall of silence thrown up by Clear Channel and the show's host, George Noory,

3   who will simply say it is a "corporate decision" as to why Morton has been banned.

4       53.    Morton was informed by his attorney, Pedar Davission, that Ellenbogen was

5   angry because he claims he was told by Clear Channel that Morton had received "micro-

6   cassettes" of all the radio shows he had appeared on, and was somehow "withholding"

7   evidence. Micro-cassette tapes have *never* been used in radio, as far as Morton knows, and

8   regular cassette tapes of the Coast To Coast AM programs have not been available since the

9   mid to late 1990s where they were *sold* to listeners for $30 a set. Either way, Clear Channel

10   never provided Morton with *any* recordings of the show because they are available for

11   download off the Internet.

12       54.    *Subsequent* radio interviews on Coast To Coast AM were responses to questions

13   asked by the host, George Noory, about how the trading accounts were doing. Morton talked

14   about what had happened, how the accounts had tanked, and that participants were not doing

15   well and had been destroyed in the Asian collapse.

16       55.    The *illegal closure* of *all* the FX trading accounts by FXCM due to malicious

17   complaints by people like Christopher Bass and Carol Dunn and the SEC investigation was

18   responsible for the loss of nearly $160,000. Morton considered legal action against FXCM

19   but with all the funds gone, there were no resources to do so.

20       56.    Morton believes Weber specifically targeted him, as Weber is the progenitor of

21   this entire scheme. Morton had *never* done anything like this before, and when it looked like

22   a good deal, he got his friends involved. Because of the early success people were literally

23   knocking down Morton's tree house trying to get in. Morton was simply overwhelmed by the

24   response.

11

57.   In *every* conversation with participants Morton's advice was *always* that they should invest their money as follows: 1/3 gold or silver, 1/3 safe blue chip stocks, and *only* 1/3 or *less* of funds they could afford to lose in a high risk capital investment.   Morton continued to *stress* that FX was like gambling in a casino and that if one was not ready to put his or her money on black, lose it all and walk out, then one should *not* be involved.   This warning was *also* on any and *all* paperwork that was given out upon request.

58.   Lloyd Ortiz ("Ortiz") provided evidence that Morton had enticed him into investing more funds in the club.   Ortiz and Morton had been longtime friends.   Ortiz had made a great deal of money from Morton's advice in the past, so he contacted Morton often asking for tips, stocks and advice. Ortiz contacted Morton asking what he should do.

59.   Morton felt they would be making much more money if his predictions about the dollar and the Euro came true.   Although those predictions did come true, Weber again refused to follow Morton's advice, claiming that it went "against all my charts, graphs and research." Weber was the trader who was making the calls.

60.   Vajra Productions, LLC and Magic Eight Ball Distribution, Inc. were preexisting entities that were originally set up to produce and distribute a movie Morton wrote and directed.   The entity 27 Investments was set up at the direction of Weber, as he wanted another account to place funds in to make things, as he stated "more manageable."

61.   Ellenbogen and the SEC issued blanket subpoenas for all accounts to Bank of America, though Morton had already supplied them with all the accounting for the accounts involved.

62.   Ellenbogen and the SEC *illegally* subpoenaed another company called 27 Investments, LLC, out of Florida. This LLC had absolutely nothing to do with Morton or Weber and was, in fact, a real estate holding company that just, coincidentally had the same

1   name and just happened to bank with Bank of America in Florida. Morton was accused of

2   hiding $6.8 million in assets, which, in fact, belonged to another company, which had nothing

3   to do with Morton or Weber.

4       63.     It appears that Ellenbogen, Johnson, and the SEC used this erroneous

5   information obtained mistakenly by subpoenas to launch this *entire investigation* and now

6   they are back-peddling in a desperate effort to find something or anything that Morton did

7   wrong to justify the vacation to California to see friends, go to Disneyland and eat In And Out

8   Burgers.

9       64.     It also appears that Ellenbogen used information he obtained to get Morton's

10  friends in the investment club to provide evidence against Morton with the allegation that

11  Morton had somehow stolen everyone's money, and that the SEC could get it all back.

12      65.     This erroneous information was told to Christopher Bass, due to Ellenbogen's

13  pre-existing relationship with him, and has now resulted in Bass filing lawsuits against

14  everyone involved.

15      66.     On the television show 60 Minutes, which aired Sunday, March 1, 2009,

16  experts spoke about the all around general incompetence of the staff of the New York

17  office of the SEC. The show demonstrated that the reason the SEC had never caught

18  people like Bernie Madoff earlier is that the SEC did not employ people who had an

19  understanding of accounting, stocks, or the markets. The SEC employed only attorneys

20  who could catch people on procedure and forms that were not filled out correctly.

21      67.     The Mortons are currently pending investigation in a case involving the SEC.

22      68.     The Mortons are informed and believe thereon that they—and millions of others

23  like them—are victims of a directive issued by President George H.W. Bush and/or the

24  Department of Justice in 1989 to ignore the Constitutional rights of defendants in criminal

13

1   cases, in violation of federal criminal statutes 18 U.S.C. §§ 2, 3, 4, 1503, 1963, and other

2   federal criminal statues.

3       69.    The Morton's evidence is as follows:

4       70.    When you see a group of people all doing the same thing, it is because they all

5   have the same motive or directive. For example, when you see federal judges routinely

6   ignoring the theft of confiscated cash, precious metals, jewelry, and even narcotics in

7   forfeiture cases, you can pretty much safely assume that the judge himself has put his hand in

8   the cookie jar. That is, when it comes to people misbehaving, you look for a *pattern* in order

9   to determine the motive or directive. *E.g.*, in forfeiture cases, the obvious motive is greed.

10      71.    Criminal cases are a lot trickier. Why do federal judges ignore the law and the

11  evidence in criminal cases in order to uphold criminal convictions? What *motive* could they

12  possibly have?

13      72.    There is a lot of public misconception concerning the "independence" of the

14  federal judiciary, "separation of powers," etc. However, such "independence" is simply a

15  myth.

16      73.    Here are a couple of examples to prove the point.

17                     Manolo Soto-Perez and Two Other Fisherman
                       Case No. 3:07-CR-00208 (District of Puerto Rico)

18

19      74.    Manolo Soto-Perez and his two co-defendants were three black fishermen from

20  the Dominican Republic. They were picked up by a Dominican Coast Guard cutter when they

21  ran out of gas in the waters off the Dominican Republic and later taken in by a British

22  warship. The British warship was acting in conjunction with an American helicopter which

23  had three black men in a boat under surveillance who were attempting to pull over 1200

24  pounds of cocaine out of the water. The helicopter had the boat under video surveillance, lost

1    contact, and resumed surveillance of the *wrong boat* (it had 3 black men in it, which was

2    apparently "close enough" for U.S. authorities).

3        75.    When the video was enlarged for the jury, you could plainly see a man in the

4    middle of the boat in his 20s and skinny. The three defendants at trial were obviously middle-

5    aged and either husky or portly. At this juncture the U.S. Marshals on duty there were saying,

6    "This defense team has it in the bag."

7        76.    The jury went out to deliberate and sent a note back in to federal judge Jose A.

8    Fuste, asking for an instruction on identification. His instruction went something like, "It's

9    like a lineup—maybe it's them, maybe it's not." *I.e.*, he was sending them a not-so-subtle

10    message that he, federal judge Jose A. Fuste, *wanted* a conviction.

11        77.    The three men were found guilty and Judge Fuste sentenced them to 20 years

12    each. The convictions are currently on appeal. Judge Fuste should have been wearing a white

13    robe with a hood instead of a black one.

14                              Marcus Rogozinski
                 Case No. 6:08-CR-28 (Middle District of Florida)

15

16        78.    Marcus Rogozinski was a federal air marshal who was sent what was purported

17    to be a $10 million treasury check from a woman named Vira Hong, part of which was

18    supposed to be an out-of-court settlement for cat scratch fever he had contracted from a cat

19    she left with him when she went on a trip.

20        79.    Rogozinski took the check to the local Bank of America and asked them what to

21    do with it. They told him to deposit it and see if it cleared—the worst that could happen was

22    that he would be charged a $35 fee if it didn't clear. He did what they told him to do and

23    never tried to withdraw a penny of it. Subsequently he was indicted, went to trial, and was

24    convicted.

80.     However, in order to insure a conviction, the prosecutor asked him for his medical records for his cat scratch fever. Rogozinski responded that he hadn't known he was going to need them, and the prosecutor then informed everyone in the courtroom that Marcus Rogozinski couldn't produce those records because they didn't exist. Rogozinski's attorney didn't object nor did federal judge Gregory A. Presnell issue any type of curative instruction. The prosecutor then made that statement two more times in front of the jury.

81.     At sentencing Rogozinski tried to bring this prosecutorial misconduct to the attention of Judge Presnell. Instead of doing what *all* the precedent says a judge is supposed to do, Judge Presnell stood behind the bench and started *screaming* at Rogozinski. The judge sentenced Rogozinski to 7 years in prison and had him locked up immediately.

82.     The *only* reason that federal judges in areas as diverse as Connecticut, New York, Puerto Rico, and Florida are all misbehaving in the same fashion is that they are all obeying the *same directive*. That directive can only be emanating from the executive branch of the government.

83.     When did this misbehavior and obvious flouting of the Constitution originate? It began in 1989 and here's why.

84.     In 1984 the alcohol industry in the United States was a 50 billion dollar a year industry.

85.     In 1985 the alcohol industry in the United States was a 49 billion dollar a year industry.

86.     In 1986 the alcohol industry in the United States was a 48 billion dollar a year industry.

87.     What was happening was that the sales of illegal drugs (marijuana, cocaine, heroin, and the like) were making vast inroads into the profits of the alcohol industry.

16

Alcohol is a depressant.  Most illicit drugs are stimulants.  Most people who want to "get high" would rather be stimulated than depressed.

88.     At the time a friend of George Bush, Sr., Edgar Bronfman, a Canadian, owned 75% of the United States alcohol industry.

89.     Ergo, Congress had what some law professors described as a "legislative temper tantrum" and enacted a series of draconian sentences for crimes involving drugs.  The problem was that all the harsher sentences did was drive up the price of illegal narcotics.

90.     There were still individuals willing to "take the chance."  Most of the people smuggling and dealing drugs figured they had two things going for them: (1) they had to get caught; and (2) even if caught, the right lawyer raising the right Constitutional issues could get them out of it.

91.     For number 1, there were extensive government alphabet agencies, DEA, FBI, etc., and their informers.  The "domino theory" of prosecution worked even better with the threat of decades of prison time if a criminal defendant didn't cooperate in exchange for a lighter sentence.  A rats out B, B rats out C, etc.

92.     The problem was number 2.  Prosecutors, as the National Law Journal pointed out in an article in 1978, are the dregs of the legal profession, as the Rogozinski case illustrates.  How were the federal courts supposed to deal with all the drug dealers who were "getting away" on what the public was told were "technicalities"?  *I.e.*, such "technicalities" as found in the provisions in the Fourth, Fifth, and Sixth Amendments to the U.S. Constitution.

93.     The answer was simple.  Simply *ignore* the technicalities.  If you check back into federal criminal pretrial motions prior to 1989, you will see that a lot of Constitutional issues raised allowed criminal defendants to "get away."

17

94.     That doesn't happen any more.  If you can find an honest defense attorney working in federal criminal cases, he will tell you, in many cases, "I haven't seen anyone win a dispositive pretrial motion in 20 years."  (A dispositive motion means a favorable ruling will dispose of or dismiss the entire case.)

95.     *I.e.*, the directive issued to federal judges to ignore the Constitutional rights of defendants in federal criminal cases apparently came down during the first Bush administration.

96.     In the modern judicial decisions there is much bragging about "public confidence in the judiciary."  The obvious question here is: why should the public have any confidence in a judiciary that *claims* to be independent but acts at the direction of another branch of government?

97.     Prior to World War II the government knew how to deal with judicial fraud.

> The indictment names as defendants Manton, Spector, Fallon, Lotsch and Davis, and alleges that they, together with Archie M. Andrews, now deceased, Alfred F. Reilly and Almon B. Hall, and divers other persons to the grand jurors unknown, conspired to commit offenses against the United States, to wit: corruptly to endeavor to influence, obstruct and impede the due administration of justice in suits pending before certain courts of the United States; and to defraud the United States of and concerning its right to have the lawful functions of the judicial power of the United States exercised and administered free from unlawful impairment and obstruction, and more particularly its right to the conscientious, faithful, disinterested and unbiased judgment and action of the defendant Manton as the Senior Circuit Judge of the United States Circuit Court of Appeals for the Second Circuit free from corruption, partiality, improper influence, bias, dishonesty and fraud.

> *United States v. Manton*, 107 F.2d 834 (2nd Cir. 1938).

98.     Manton thought he was innocent because he was taking bribes for cases he thought should have been decided in the briber's favor anyway.  Today, as any defendant in almost any federal criminal case can prove, corruption, particularly improper influence, bias, dishonesty, and fraud are the norm.

18

99.    As a federal judge in the nineteenth century once remarked, "The minute the executive is allowed to control the courts in the administration of justice, their independence is gone." *In re Miller*, Fed.Cas. No. 9,552 (C.Ct.D.Ind. 1878).

100.    There is a lot of high-blown rhetoric in the federal courts about the Constitution.

> Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them.
>
> *Miranda v. Arizona*, 86 S.Ct. 1602, 1636 (1966).

101.    For a textbook example of federal appellate judges following the 1989 Bush directive, see *United States v. Boyd*, 208 F.3d 638 (7th Cir. 2000).

102.    It is this directive that makes it so easy and effortless for unscrupulous (these days one has to wonder, are there any other kind?) prosecutors to secure convictions and terrorize criminal defendants into draconian "plea bargains," regardless of their guilt or innocence.

## LEGAL CLAIMS

### FIRST CAUSE OF ACTION
5 U.S.C. § 703, 28 U.S.C. § 1361
Against Bennett Ellenbogen and Tim Johnson to halt their Unauthorized Investigation

103.    The innocence or guilt of those being investigated at the hands of these two incompetent individuals is irrelevant.    The SEC has *no* jurisdiction in foreign currency transactions.

104.    The case law is quite plain.

I. CFTC Jurisdiction.

> The CEA provides that no person shall enter into, or offer to enter into, a transaction involving the sale of a commodity for future delivery, unless it is conducted on or through a "board of trade" designated and regulated by the CFTC as a contract market. 7 U.S.C. § 6.

19

1        In addition, the 1974 Treasury Amendment exempts certain foreign currency transactions from the CEA: "Nothing in this chapter shall be deemed to govern or in any way be applicable to transactions in foreign currency . . . unless such transactions involve the sale thereof for future delivery conducted on a board of trade." 7 U.S.C. § 2(ii). The district court held that regardless of whether foreign currency transactions are futures or spot trades, they are exempted from CFTC jurisdiction because they are not transactions involving sales on a board of trade. We agree.

*Commodity Futures Trading Commission v. Frankwell Bullion Limited*, 99 F.3d 299 (9th Cir. 1996) (footnote omitted).

105.   *I.e.*, even *if* what Defendants Bennett Ellenbogen and Tim Johnson was

investigating subject to Government regulation (which it is not) the *wrong agency* is doing the

"investigating."

        We agree with the Standard Forex court that the term "board of trade" is ambiguous, thus necessitating an examination of the legislative history. We interpret that legislative history differently, however; as discussed above, we hold that Congress intended the "transactions conducted on a board of trade" to mean on-exchange trades. To hold, as Standard Forex did, that the Treasury Amendment excludes only transactions between banks and other sophisticated investors would require this court to craft, without any support from the statutory language, some distinction between sophisticated investors and the general public. We hold, as the legislative history indicates, that Congress intended the Treasury Amendment to exempt all off-exchange transactions in foreign currency.

        *Id.*

106.   "All" means "all."

        The CEA gives the CFTC the authority "to regulate the volatile and esoteric market in futures contracts in fungible commodities." *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 468-69 (1997) (quotations omitted)." The Act requires that these 'futures contracts' be offered and sold on commission-designated boards of trade, or they are deemed illegal 'off-exchange' contracts." *Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995). When Congress expanded the statute's coverage in 1974 to include futures contracts in nonagricultural commodities, it also enacted an exception, the so-called "Treasury Amendment" to the CEA, 7 U.S.C. § 2(ii):

        "Nothing in this chapter shall be deemed to govern or in any way be applicable to transactions in foreign currency . . . unless such transactions

1     involve the sale thereof for future delivery conducted on a board of trade."

2     . . . Dunn established conclusively that the amendment "was intended to take all
      transactions relating to foreign currency not conducted on a board of trade
3     outside of the CEA's ambit." *Id.* at 475. *See Commodity Futures Trading
      Comm'n v. Frankwell Bullion Ltd.*, 99 F.3d 299, 301 (9th Cir. 1996) ("regardless
4     of whether foreign currency transactions are futures or spot trades, they are
      exempted from CFTC jurisdiction because they are not transactions involving
5     sales on a board of trade" (footnote omitted)).   Congress recognized that
      "sophisticated off-exchange foreign currency trading . . . had previously
6     developed entirely free from supervision under the commodities laws," *Dunn*,
      519 U.S. at 473, and that "this market is more properly supervised by the bank
7     regulatory agencies." *Id.* at 474 (quotations omitted).

8     *Commodity Futures Trading Commission v. Topworth International, LTD*, 205
      F.3d 1107 (9th Cir. 1999).

9

10    107.   Could it be any plainer?

11                          SECOND CAUSE OF ACTION
                 Federal Rule of Criminal Procedure 6(a) and 18 U.S.C. § 3332(a)
12                      Against Bennett Ellenbogen and Tim Johnson

13    108.   The felonies committed by Defendants Bennett Ellenbogen and Tim Johnson are

14    clearly explained in Ninth Circuit case law.

15    109.   The elements of "direct" mail and wire fraud are (1) engaging in a scheme or

16    artifice to defraud and (2) using or causing the use of the mails or wires in order to further the

17    fraudulent scheme or artifice. *United States v. Manion*, 339 F.3d 1153, 1156 (9th Cir. 2003)

18    (per curiam).

19    110.   The statute that Defendants Bennett Ellenbogen and Tim Johnson violated is

20    quite clear.

21    **18 U.S.C. § 1346. Definition of "scheme or artifice to defraud"**
      For the purposes of this chapter, the term "scheme or artifice to defraud"
22    includes a scheme or artifice to deprive another of the intangible right of honest
      services.

23

24    111.   For an excellent detailed explanation of the conduct prohibited by 18 U.S.C. §

                                        21

1  1346, see *United States v. Weyrauch*, 548 F.3d 1237 (9th Cir. 2008).  See also 18 U.S.C. §

2  371 (conspiracy).

3      112.  The statute allowing any person to present evidence of criminal acts in violation

4  of federal law is quite clear.

5         Chapter 216—Special Grand Jury
       18 U.S.C. § 3332. Powers and duties

6         (a) It shall be the duty of each such grand jury impaneled within any judicial
       district to inquire into offenses against the criminal laws of the United States

7         alleged to have been committed within that district.  Such alleged offenses may
       be brought to the attention of the grand jury by the court or by any attorney

8         appearing on behalf of the United States for the presentation of    evidence.
       **Any such attorney receiving information concerning such an alleged offense**

9         **from any other person shall, if requested by such other person, inform the**
       **grand jury of such alleged offense, the identity of such other person, and**

10        **such attorney's action or recommendation.**

11     113.  Plaintiffs are well aware of the roadblocks to the federal grand jury that

12 Department of Justice employees will attempt to erect.

13        At the outset, I would point out that plaintiffs do not seek to compel the U.S.
       Attorney to prosecute the named defendants.  Rather, they seek to have either

14        the court or the United States Attorney present certain information to the grand
       jury.  This distinction is critical because almost the entirety of the opposition to

15        plaintiffs' motion is based on the mischaracterization by the U.S. Attorney and
       the other defendants of plaintiffs' motion as one seeking to compel the U.S.

16        Attorney to initiate proceedings against the other defendants.

17        *In Re Grand Jury Application*, 617 F. Supp. 199 (S.D.N.Y. 1985).

18     114.  *I.e.*, Plaintiffs fully expect the Department of Justice to mischaracterize a request

19 for investigation and presentation of evidence with a request for prosecution.

20        Contrary to what Judge Bork stated, Congress has divided the execution of the
       law into segments, with the presentation of information to the grand jury

21        concerning racketeering violations being an area where the prosecutor's
       discretion was explicitly removed.

22        *Id.*

23        In other contexts, courts have acknowledged that prosecutorial discretion is not

24        absolute.  In *Powell v. Katzenbach*, 123 U.S. App. D.C. 250, 359 F.2d 234, 235

(D.C. Cir. 1965), *cert. denied*, 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 359 (1966), the court stated: "[w]e will assume, without deciding, that where Congress has withdrawn all discretion from the prosecutor by special legislation, a court might be empowered to force prosecutions in some circumstances." This term in *Wayte v. United States*, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547, 53 U.S.L.W. 4319 (March 19, 1985), the Supreme Court stated that prosecutorial discretion is not "'unfettered.' Selectivity in the enforcement of criminal laws is . . . subject to constitutional constraints." 53 U.S.L.W. at 4322 (quoting *United States v. Batchelder*, 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979)).

*Id.*

In suggesting this amendment, we are mindful of and are fully in accord with the well-established tradition of citizen complaints. We know that criminal justice should and must be everyone's concern, and we favor doing everything proper to encourage greater cooperation by citizens in the war against organized crime. On the other hand, we are equally cognizant that the proper role of the professional prosecutor in the United States has been steadily emerging. It is our belief that the prosecutor should properly be vested with the responsibility of professionally screening allegations of criminal misconduct. At the same time, we recommend that there be built into the process a safeguard that will require the prosecutor to give an accounting of his screening.

*Id.*

115. The obvious question here is: how is the prosecutor supposed to screen his own criminal acts?

Thus both the language of 18 U.S.C. § 3332(a) and its legislative history indicate that Congress intended to remove the prosecutor's discretion in deciding whether to present information to the grand jury. He retains discretion with respect to how he acts and what he recommends concerning that information.

*Id.*

Since the United States Attorney has been requested to present certain information to the grand jury he must do so. I will not relieve him of a duty which Congress has seen fit to impose. 18 U.S.C. § 3332(a) imposes a "plainly defined and peremptory duty" on the part of the United States Attorney to present the plaintiffs' information concerning the alleged wrongdoing of the other defendants to the grand jury.

*Id.*

23

Request to Convene Conventional Grand Jury
Federal Rule of Criminal Procedure 6(a)

116.    Under succeeding waves of both Republican and Democratic appointees, citizen access to federal grand juries has simply evaporated. Prosecutors regularly block citizens who wish to present evidence of violations of federal criminal law to their fellow citizens sitting on grand juries.

117.    For a textbook example of a prosecutor "over-riding" a federal grand jury see *In re Grand Jury Proceedings*, 813 F.Supp. 1451 (D. Cal. 1992) and the account of this case by Burnham in *Above the Law*.

118.    This was not always the case.

> The Judge explained that he was not suggesting that any indictment be returned, but that it was his duty to direct the attention of the grand jury to possible violations of criminal laws for investigation.

> *O'Bryan v. Chandler*, 352 F.2d 987 (10th Cir. 1965).

119.    *I.e.*, the *judges* informed the grand jury of how grand juries were *supposed* to work.

> The grand jury was regularly convened in the United States District Court for the Western District of Oklahoma, of which Judge Chandler was the Chief Judge. Acting in that capacity, he had qualified the grand jury, designated its foreman and deputy foreman, and submitted to it the usual instructions. It was an appendage to the court over which he presided. *Brown v. United States*, 359 U.S. 41, 79 S.Ct. 539, 3 L.Ed.2d 609, *rehearing denied*, 359 U.S. 976, 79 S.Ct. 873, 3 L.Ed.2d 843.

> *Id.*

120.    See Federal Rule of Criminal Procedure 6(a).

> If it has not already been done, the trial court is directed to summons a grand jury for the purpose of sifting thoroughly every angle and side of this case, to the end that, if there has been perjury by witnesses, or subornation thereof, by counsel or others, those guilty thereof shall be punished. Particular attention

24

1    should be paid to subornation, for intelligence that procures and directs is more
     guilty than ignorance which carries out.

2
     *Arbor v. Blue*, 45 F.2d 746 (10th Cir. 1930).

3

4    121.    *I.e.*, the individuals responsible for exerting undue influence on federal judges

5    are more guilty than those influenced.

6                           THIRD CAUSE OF ACTION
                         Intimidation of the Judiciary and Others
7                              Title 18 U.S.C. § 1503
                       Hundreds of Thousands of Predicate Acts Under RICO
8

9    122.    Every time a federal judge issues a corrupt ruling in favor of the Government, a

10   violation of 18 U.S.C. § 1503 has occurred.

11   123.    Our ancestors tried to warn us.

12   The honorable gentleman has told us that these powers given to Congress are
     accompanied by a judiciary which will correct all. On examination you will find
13   this very judiciary oppressively constructed, your jury trial destroyed, and the
     judges dependent on Congress.

14
     . . . Show me that age and country where the rights and liberties of the people
15   were placed on the sole chance of their rulers being good men without a
     consequent low of liberty! I say that the loss of that dearest privilege has ever
16   followed, with absolute certainty, every such mad attempt.

17   Patrick Henry (1736–99), *Shall Liberty or Empire Be Sought?* (1788), from *The
     World's Famous Orations. America: I. (1761–1837)* (1906).

18

19   124.    Even today an occasional (and all too frequent) federal judge reiterates the

20   principle.

21   [U]ltimately, the guarantee of [our] rights is no stronger than the integrity and
     fairness of the judge to whom the trial is entrusted.

22
     *Bracy v. Gramley*, 81 F.3d 684, 703 (7th Cir. 1996) (dissent), *reversed*, 520 U.
23   S. 899, 117 S.Ct. 1793 (1997).

24   Whoever attentively considers the different departments of power must perceive,

                                         25

that, in a government in which they are separated from each other, the judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the Constitution; because it will be least in a capacity to annoy or injure them. The Executive not only dispenses the honors, but holds the sword of the community. The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither FORCE nor WILL, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments.

Alexander Hamilton, Federalist No. 78 (1788), The Federalist Papers.

125. Unfortunately, it appears that the federal judiciary now depends on the Executive for its *direction*.

This simple view of the matter suggests several important consequences. It proves incontestably, that the judiciary is beyond comparison the weakest of the three departments of power [1] ; that it can never attack with success either of the other two; and that all possible care is requisite to enable it to defend itself against their attacks. It equally proves, that though individual oppression may now and then proceed from the courts of justice, the general liberty of the people can never be endangered from that quarter; I mean so long as the judiciary remains truly distinct from both the legislature and the Executive. For I agree, that "there is no liberty, if the power of judging be not separated from the legislative and executive powers." [2] And it proves, in the last place, that as liberty can have nothing to fear from the judiciary alone, but would have every thing to fear from its union with either of the other departments; that as all the effects of such a union must ensue from a dependence of the former on the latter, notwithstanding a nominal and apparent separation; that as, from the natural feebleness of the judiciary, it is in continual jeopardy of being overpowered, awed, or influenced by its co-ordinate branches; and that as nothing can contribute so much to its firmness and independence as permanency in office, this quality may therefore be justly regarded as an indispensable ingredient in its constitution, and, in a great measure, as the citadel of the public justice and the public security.

*Id.*

126. As Plaintiffs pointed out in their FACTS section, the federal judiciary appears to have been overpowered, awed, and influenced by the Executive, regardless of "life tenure."

127. There are a plethora of cases illustrating and explaining "separation of powers."

26

1

> The Constitutional principle of separation of powers protects each of the three Branches of the federal government from encroachment by either of the other Branches. Article III of the Constitution "establishes a 'judicial department' with the 'province and duty . . . to say what the law is' in particular cases and controversies." *Plaut*, 514 U.S. at 218 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). The separation of powers "serves both to protect the role of the independent judiciary within the constitutional scheme of tripartite government, . . . and to safeguard litigants' right to have claims decided before Judges who are free from potential domination by other branches of government." *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 848 (1986) (internal quotation marks omitted).

> *Benjamin v. Jacobson*, 172 F.3d 144 (2nd Cir. 1999).

128.    Given the pressure that the Department of Justice regularly exerts against federal judges, the foregoing is simply not true.

129.    The object of the doctrine "is basic and vital, namely, to preclude a commingling of the . . . essentially different powers of government in the same hands." *O'Donoghue v. United States*, 289 U.S. 516, 530 (1933) (citation omitted).

> The second component of the separation of powers doctrine safeguards the rights of litigants vis-a-vis the judicial branch. Litigants have a "right to have claims decided before judges who are free from potential domination by other branches of government." *Schor*, 106 S.Ct. at 3256 (quoting *United States v. Will*, 449 U.S. 200, 218, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980)).

> *United States v. Garcia*, 848 F.2d 1324 (2nd Cir. 1988).

130.    Separation of powers is "a doctrine to which the courts must adhere even in the absence of an explicit statutory command," *Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1086 (D.C. Cir. 1980), and "requires that a branch not impair another in the performance of its constitutional duties," *Loving v. United States*, 517 U.S. 748, 757 (1996).

131.    In the words of Mr. Justice Brandeis, "The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power." *Myers v. United States*, 272 U.S. 52, 293 (1926) (dissent).

132.    The doctrine of separation of powers is "one of the organizing principles of our

1   system of government." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 469 (1977).

2   133.   "It is . . . essential to the successful working of this system that the persons

3   intrusted with power in any one of [the] branches [of government] shall not be permitted to

4   encroach upon the powers confided to the others." *Kilbourn v. Thompson*, 103 U.S. 168, 191

5   (1880).

6   134.   Such encroachment is done on a regular basis by members of the Justice

7   Department putting pressure on federal judges to behave and issue rulings in a certain fashion.

8   Plaintiff is informed and believes thereon that he will be able to furnish affidavits to that

9   effect if this case is allowed to proceed through the courts in the fashion intended by

10  Congress.

11  135.   There is also the issue of discovery.

12  136.   Litigants who must frame their claims before obtaining discovery often find it

13  necessary to conform their theories to the facts as time goes on . . . *Adler v. Pataki*, 185 F.3d

14  35, 41 (2nd Cir. 1999).

15  137.   "If discovery is necessary to establish a claim, then it is not unreasonable to file

16  a complaint so as to obtain the right to conduct that discovery." *Kraemer v. Grant County*,

17  892 F.2d 686, 690 (7th Cir. 1990).

18  138.   Plaintiffs realize that they may be merely "running the gantlet" of an

19  increasingly corrupt and almost totally unresponsive federal court system in order to put their

20  grievances before Congress.

21  139.   Plaintiffs' view of the Courts is hardly a new one.

22  Mr. O'CONNOR of New York. . . . I am against the bills to create additional
Federal judges, having been consistently against such bills, because I am a

23  Democrat. Being a Democrat, I can not reconcile my Democratic principles
with voting to increase the Federal judiciary when I recall the tyranny of its past

24  and its deplorable present, its interference and usurpation of State and local

1   rights. Nor can I understand how any Democrat can vote for any bill to augment
    the Federal judiciary. I welcome an opportunity to vote to abolish it. . . .

2
    Mr. BACHMANN. Do I understand the gentleman is opposed to all the judge
3   bills?

4   Mr. O'CONNOR of New York. Yes.

5   Mr. BACHMANN. Is the gentleman opposed also to filling the place of Judge
    Winslow, who resigned in the southern district of New York, and where a
6   successor was stated, in the report of the judicial conference, signed by the late
    Judge Taft, to be badly needed in the southern district of New York?

7
    Mr. O'CONNOR of New York. Yes, sir. I am opposed to that also. I would
8   rather permit that vacancy to stand as a monument to remind us of the corruption
    that went on while it was filled, and is still going on in the Federal courts.

9
    *Congressional Record*, Volume 72, page 9,980 (June 3, 1930) (71st Congress,
10  2nd Session).

11      140.    *I.e.*, Plaintiffs are well aware that he may be forced to go all the way through

12  being summarily "tossed out of court" at this level within days, with that ruling affirmed in

13  the Ninth Circuit Court of Appeals, and certiorari denied by the U.S. Supreme Court.

14      141.    However, once Plaintiffs have run the gantlet of an increasingly useless and

15  oppressive court system, they then have recourse to Congress (after building a record of the

16  futility of attempting to achieve anything in the federal court system).

17      142.    Congress has the authority to over-rule wrongly decided cases.  *Wesson v.*

18  *United States*, 48 F.3d 894, 901 (5th Cir. 1995).

19      143.    Congress . . . may cure any error made by the courts.  *Fast v. School District of*

20  *City of Ladue*, 728 F.2d 1030, 1034 (8th Cir. 1984) (en banc).

21      144.    Congress has the power to counter judicial doctrine.  *Belgard v. State of Hawaii*,

22  883 F.Supp. 510, 514 (D. Hawaii 1995).

23                              **RELIEF REQUESTED**

24      WHEREFORE, Plaintiffs request:

                                        29

1.   That this case be allowed to proceed through the courts like any other;

2.   That Plaintiffs be allowed discovery and leave to amend;

3.   That Defendants Bennett Ellenbogen and Timothy Johnson be enjoined from further "investigation" of the Plaintiffs;

4.   That this Court declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that the SEC has no jurisdiction regarding matters of currency trading;

5.   That Plaintiffs be allowed to present their grievances of the criminal misconduct of Defendants Bennett Ellenbogen and Timothy Johnson to either the Los Angeles Special Grand Jury, pursuant to 18 U.S.C. § 3332(a);

6.   That the practice of the Department of Justice attorneys putting pressure on federal judges concerning their rulings be declared a felony, pursuant to 18 U.S.C. § 1503;

7.   Such other relief as this Court deems just, proper, and equitable.

Respectfully submitted,

Dated: March 18, 2009

Sean David Morton, Pro se
2207 Hermosa Avenue
Hermosa Beach, CA 90254
(310) 374-6039

Melissa Morton, Pro se
2207 Hermosa Avenue
Hermosa Beach, CA 90254
(310) 374-6039

30

1

## VERIFICATION OF COMPLAINT

2    I verify under penalty of perjury, that I am a plaintiff in the above entitled action; I have

3    read the above complaint and have knowledge of the facts stated therein, and the matters and

4    things stated there are true and correct, except as to those matters stated to be on information

5    and belief, and as to those matters I verify as aforesaid that I verily believe them to be true.

6

7    March 18, 2009

Sean David Morton

8

9

10   ## VERIFICATION OF COMPLAINT

11   I verify under penalty of perjury, that I am a plaintiff in the above entitled action; I have

12   read the above complaint and have knowledge of the facts stated therein, and the matters and

13   things stated there are true and correct, except as to those matters stated to be on information

14   and belief, and as to those matters I verify as aforesaid that I verily believe them to be true.

15

16   March 18, 2009

Melissa Morton

17

18

19

20

21

22

23

24

31

Melissa Morton
2207 Hermosa Avenue
Hermosa Beach CA 90254
310-374-6039

FOR OFFICE USE ONLY

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

Sean David Morton, Melissa Morton

PLAINTIFF(S)

v.

BENNETH ELLENBOGEN,
(See Attached)

DEFENDANT(S).

CASE NUMBER

**CV09 1875** PA(JCx)

**SUMMONS**

TO:   DEFENDANT(S):   BENNETH ELLENBOGEN, (See Attachment)

A lawsuit has been filed against you.

Within __60__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, Sean David and Melissa Morton, whose address is 2207 Hermosa Avenue, Hermosa Beach, CA 90254 . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.   You also must file your answer or motion with the court.

Clerk, U.S. District Court

SEAL

Dated: __3-18-09__

By: _____
                                Deputy Clerk

(Seal of the Court)

FOR OFFICE USE ONLY

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                    SUMMONS

Sean David Morton
Melissa Morton
2207 Hermosa Ave.
Hermosa Beach, CA 90254
310-374-6039

**IN THE**

1

2

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

3   SEAN DAVID MORTON,          )          Civil Action No.
    MELISSA MORTON,             )
4                               )
                                )
5       Plaintiffs,             )
                                )          **COMPLAINT**
6   vs.                         )
                                )
7   BENNETT ELLENBOGEN,         )
    TIM JOHNSON,                )
8   ERIC HOLDER, Jr.,           )
    Attorney General of the United States,  )
9   THOMAS P. O'BRIEN, U.S. Attorney  )
    For the Central District of California,  )
10  And other unknown federal employees,  )
                                )
11      Defendants.             )
    _____)

12                  **STATEMENT OF THE CASE**

13      Plaintiffs are the targets of an investigation by the United States Securities and

14  Exchange Commission ("SEC") launched by two (or more) dishonest and incompetent SEC

15  employees, who apparently need to justify a trip to California in order to visit Disneyland and

16  eat In And Out Burgers at the taxpayers' expense.

17      That Plaintiffs will be indicted is a foregone conclusion, regardless of guilt or

18  innocence, due to a directive issued by the first Bush administration in 1989.

19      Rather than go to a jury trial, the wrong a federal defendant should suffer is whatever

20  the prosecutor wants not what justice is called for.

21                  **JURISDICTION**

22  1.      Jurisdiction of this Court is invoked pursuant to:

23      a.      Title 5 U.S.C. § 703 of the Administrative Procedure Act;

24      b.      Federal Rule of Criminal Procedure 6(a), to convene a grand jury;

1

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☑) | DEFENDANTS |
|---|---|
| Sean David Morton and Melissa Morton | Bennett Ellenbogen, Tim Johnson, U. S. Attorney General Eric Holder, Jr., and U.S. Attorney for the Central District of California Thomas P. O'Brien |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Sean David Morton and Melissa Morton, Pro se<br>2207 Hermosa Avenue, Hermosa Beach, CA  90254<br>(310) 374-6039 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☑ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes  ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No    ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)
Title 28 U.S.C. § 1361; Federal Rule of Criminal Procedure 6(a); SEC employees used investigation of the plaintiffs to justify a Los Angeles vacation at taxpayers' expense

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☑ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | **IMMIGRATION** | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☑   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☑   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
  **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _Sean David Morton_  Date _March 18, 2009_

Notice to Counsel/Parties:   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Percy Anderson and the assigned discovery Magistrate Judge is Jacqueline Chooljian.

The case number on all documents filed with the Court should read as follows:

## CV09- 1875 PA (JCx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.